IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH ABEEL, *et al.*, | |
| Plaintiffs, | |
| v. | No. 12-cv-04269-JBW-RML |
| BANK OF AMERICA, N.A., *et al.*, | |
| Defendants. | |

## MOTION TO INTERVENE OF RIGHT

**COME NOW** Edmund Smith and Judith Smith, hereafter "Smiths", for their motion to intervene-of-right under provisions of Fed. R. Civ. P. 24(a)(2) claiming they have a valid interest in Court transactions effecting those business entities who owned, possessed or controlled Defendant EMC Corporation's conduct during times pertinent, and those who controlled or subsequently acquired the Defendant EMC Corporation such as Bear Stearns and Defendant J.P. Morgan, respectively.

a.   The Smiths are so situated that decisions of this Court affecting Defendant EMC Corporation and those Defendants with subsequent prevailing interests may, as a practical matter, impair or impede their ability to protect their common interests.

b.   Accordingly, the Smiths believe there is just cause for the intervention, the intervention is of right, and they therefore submit as ground for their motion, the following:



1

## I. Background

1. Not once were monthly payments ever late or missing as required by their original mortgage loan note; however and much to their surprise, they were served with a court summons to answer a complaint for foreclosure on their home.

2. The Smiths reviewed their mortgage payment records and verified that they submitted all mortgage payments in a timely manner to the only address they were ever given under provisions of the February 1999 mortgage loan note. The foreclosure complaint implied that EMC Corporation acquired the United Companies Financial Corporation mortgage loan note. Moreover, Defendant EMC Corporation had not provided them with a new payment address or that United Companies Financial Corporation had filed for bankruptcy, see Exhibit "2" below. The information was crucial and necessary for them to reap the rewards of timely, accurate, and correct payments on their loan provisions. See Exhibit "1", 3/14/2006 Letter to UC Lending.

3. Apparently, all timely mortgage payments made by the Smiths were going directly into a trust fund created by the bankruptcy court in Louisiana, and in 2006, EMC Corporation took advantage of that payment discrepancy predicated on the fact that the Smiths has accumulated a sizeable equity in the property during the eight (8) years of payments in addition to their initial $235,000.00 down payment. See Exhibit "2", Email on bankruptcy received 7/19/2007; and Exhibit "3" Letter From EMC Corp. dated 11/8/2006 8 months after our letter: Exhibit (1").

4. There was a provision in paragraph 20 of their original loan agreement that the loan could be sold to others whenever the lender chose to do so, that the lender could conclude a sale with whoever they chose, and that they could do so without notifying the Smiths when such sale occurred.

## II. Enter a Fundamental Loan Agreement Defect

5. The Smiths were unaware at the initial note signing ceremony that the specific sale provision of paragraph 20 of the mortgage loan violated 14 Stat. 546, 42 U.S.C. § 1994, in that no financial obligation is legally valid which grants possession and control of the Smiths' financial affairs *conduct* to others without their knowledge, participation, or consent. Such financial practices are common and widespread in the mortgage financial industry, despite the illegality and may be responsible for the source of frauds sweeping the entire financial industry today.

## III. Consequences of Loan Agreement Defect

6. Criminal statutes under provisions of 14 Stat. 546 for violations of said § 1994 provisions apply to all persons, business entities, judges, and attorneys who traffic for financial benefit exercising an existing system of peonage, and who also use legal coercion to corruptly interfere with a court's judicial machinery to procure a favorable judgment. See:

   (1) *Bulloch v. U.S.*, 763 F.2d 1115 at 1121 for corrupt judicial practices,

   (2) 14 Stat. 546, currently codified as 42 U.S.C. § 1994 and 18 U.S.C. §§

1581 *et seq.*, which address conditions for a system of peonage, where 18 U.S.C § 1595 provides authority for a civil remedy; and which indicates the conditions that establish, maintain, and enforce a system of peonage on unwary free citizens, and

(3) <u>Imbler v. Pachtman</u>, 424 U.S. 409 at 429, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976):

> This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law. Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U.S.C. § 242,[28] the criminal analog of § 1983. O'Shea v. Littleton, 414 U.S. 488, 503, 94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974); cf. Gravel v. United States, 408 U.S. 606, 627, 92 S.Ct. 2614, 2628, 33 L.Ed.2d 583 (1972). The prosecutor would fare no better for his willful acts

### IV. The Existing Situation Became Expanded and Exacerbated

7. Unfortunately, the foregoing does not portray the worst case situation. There were no persons lawfully holding state public offices anywhere within the State of New Mexico since before 1963; those who held state public office unlawfully at all times since 1963 did so by knowingly denying the power of both constitutions and intentionally defying the authorities of applicable state statutes; thereby, they, each and every one of them, jointly and severally engaged in an insurrection against both constitutions.

8. The insurgents also converted for personal use state public appropriations for received by them as salaries. The constitutional and statutory defects became exacerbated because some of the state insurgents were later nominated for federal commissions and failed to inform the President and the United States Senate in

their submitted Financial Disclosure Statements required of them within 30 days of being nominated that the prior year's income was embezzled state publicly appropriated funds, a second degree state felony and a fourth degree federal felony for falsifying a federal report.

## V.    In the Beginning

9.    The foreclosure case was heard in the First Judicial District Court in Santa Fe, New Mexico, although the Smiths were not aware the court was not competent for lack of any person lawfully holding public office as a district judge. Nevertheless, due to incompetent representation, the case was shortly reassigned to a new imposter, and the Smiths proceeded representing themselves.

10.    The new imposter soon began to favor the EMC Corporation in his decisions, and when challenged by the Smiths on a procedural evidence issue, the judge produced a book containing the Rules of Evidence - so he said, pretended to read from the book upside down, and ruled that evidence asserted on Defendant EMC Corporation's counsel's beliefs without valid, formal written evidence was valid and could be entered into evidence. The Smiths knew better and decided that the judge, at that specific moment in that specific incident, took possession and control of their conduct in further proceedings without their recourse to a viable state court of law, and the imposter could deny them fair and objective court proceedings thereafter.

11.    In time, the imposter became over confident and rendered a judgment in the Smiths' favor; the Smiths immediately acquired a Writ of Execution and

served it on the local sheriff to enforce the judgment. They knew, somehow, that the exercise was futile where a system of peonage was operative and would be disallowed. Sure enough, the imposter quickly entertained and granted a motion to rehear the matter to vacate the judgment; but, only after the Smiths notified the court they would unavoidably be out of town and away from a phone for a few days, geographically - New Mexico is sparsely settled where they were traveling and phone service became difficult. The imposter held an emergency telephonic hearing and vacated the judgment and foreclosed upon the Smiths' home. They only learned about the decision when they returned home and too late under court rules to seek remedial action. The Smiths lost their home and considered appealing the foreclosure order; however, they now had formal evidence that there were no persons holding public office positions in both the State and District of New Mexico.

## VI. The Expanded Dilemma

12. During the same period, a federal case was being heard involving another citizen and their civil case against a person posing as a state district judge in another judicial district of New Mexico who was rendering judgments while not constitutionally or statutorily holding a state public office. Of course, the federal district court ruled against him so he timely appealed the case dismissal to the Court of Appeals for the Tenth Circuit which, after being provided evidence of the § 912 violation, affirmed the lower court decision by denying the power of the state and national constitutions and the authorities of applicable state statutes giving effect to those constitutional provisions.

13. The 2005 appeal was futile because the appeals court did not address the insurrection; nevertheless, the court issued a decision affirming the lower court judgment, and in effect, supported the federal district court's support of the statewide insurgency against both constitutions. Thus there has not been a state courts or federal court available to the Smiths to oppose the arbitrary and capricious court rulings resulting in the loss of their home, the system of peonage created thereby, and imposed upon them was reinforced as late as October 15, 2012.

14. The insurgency harming them irrevocably is defined as any group of persons, organizations, or combinations joining together to deny a power of a state or national constitution, and also to defy the statutes giving that power effect. Thereby, they engage in an insurrection against the national constitution and cannot hold public office without a sufficient vote of the United States Congress. See *In re Charge to Grand Jury*, 62 F. 828 (ND Ill. 1894), and Section 3, Fourteenth Amendment.

## VII. The Consequence

15. That specific insurgency when joining by the imposter's rendering of a foreclosure judgment on our home became a criminal conspiracy resulting in a system of peonage being imposed upon us as well as all free New Mexico citizens because those persons holding positions as state judges in courts of law were granted special privileges contrary to Section 26, Article IV, Constitution of New Mexico enabling them, and only them, to become imposter judges.

16. The said federal district court case was dismissed by a person who was one of those who falsified his Financial Disclosure Statement upon being nominated by the president for a federal judicial commission; he now poses as a federal district judge holding and exercising the authority of that office under false pretenses in violation of 18 U.S.C. ¶ 912 and does so as a fourth degree felon. Had the nominee notified the president or the senate that his income for the previous year while holding a state public office was embezzled state public appropriations; the nomination would have been swiftly withdrawn. Therefore, the non-convicted second degree state felon and fourth degree federal felon, who currently is the chief judge, is now converting, for personal use, federal public appropriated funds received as salary and thereby he is embezzling those federal funds during all times pertinent up to and including the present day.

17. Thus no state or federal court of law was, at all times pertinent, available to the Smiths; and they await a date certain when a competent court of law becomes available to them in their venue so they can seek relief under provisions of 14 Stat. 546, currently codified as 42 U.S.C. § 1994 and 18 U.S.C. §§ 1581 *et seq.*, and specifically for a 18 U.S.C. § 1595 civil relief amounting to six times the foreclosure amount in controversy.

18. The Smiths are aware that the United States Executive Department, the Legislative Department, and appropriate segments of the Judicial Department have been informed of the insurgency caused system of peonage imposed upon them; the notifications have all been futile; and that shortly after the 2012 General

Elections, they shall initiate a renewed effort to notify the appropriate Executive and Legislative Departments of their plight.

19. The Smiths realize that not having a local government agency available to them thereby subjects them and also holds their future conduct against their free will for the possession, control, and mercy of persons who hold state and federal judicial public office positions without benefit of any constitutional or statutory provision; provisions enacted to prevent their insurgency against both constitutions which had no alternative but to create the system of peonage imposed upon them and their fellow private American and New Mexican citizens.

## VIII. RELIEF SOUGHT AND DESIRED

20. The Smiths pray the Court will grant their intervention in the instant cause so that they may protect their financial interests for the irrevocable injuries and damages inflicted on them.

21. They also pray the Court will use its good offices to report the unconscionable cultural structure imposed upon them which also affects the lives of an entire population of Private New Mexican and American citizens within the State, District, and Tenth Circuit courts that are unaware of the crime against their humanity.

22. Finally, the Smiths are entitled to civil remedy of six (6) times the amount in controversy cited in their foreclosure case under provisions of Section 4, Fourteenth Amendment and under provisions 18 U.S.C. § 1595 upon compliance with other features of that specific law.

Respectfully submitted,

*Judith B. Smith*           *Edmund L. Smith*

Judith B. Smith                     Edmund L. Smith
102CR A1                           102CR A1
Sapello, New Mexico 87745        Sapello, New Mexico 87745

## IX. CERTIFICATE OF SERVICE

I **CERTIFY** that a true, correct, and complete copy of the Motion to Intervene-of-Right was sent on this 6th day of November, 2012 by first class U.S. Mail, postage prepaid, to:

Nicholas M. Moccia, P.C.
LAW OFFICE OF NICHOLAS M. MOCCIA, P.C.     Plaintiffs' Attorney
45 Page Avenue
Staten Island, New York 10309

Matthew Richard Kalinowski
MORGAN, LEWIS & BOCKUIS     Attorney for Deutsche Bank, AG
101 Park Avenue
New York, NY 10178

Christine B. Cesare
BRYAN CAVE, LLP     Attorney for Bank of America
1290 Avenue of Americas
New York, NY 10104

Nafiz Cekirge
120 Broadway, Ste. 300     Attorney for Wells Fargo
Santa Monica, CA 90401

Richard Eric Gottlieb
DYKEMA GOSSETT, PLLC     Attorney for One West Bank
One IBM Plaza
10 South Wacker Drive, Ste. 2300
Chicago, IL 60606

William Graig Sandelands     Attorney for Aurora Bank
TOMPKINS, MCGUIRE, WACHENFELD & BARRY, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

Mitra Singh
ROSICKI, ROSICKI & ASSOCIATES, P.C.   Attorney for Ocwen Financial Corp
51 East Bethpage Road
Plainview, NY 11803


David C. Singer
DORSEY & WHITNEY, LLP                 Attorney for U.S. Bank, N.A., and Ally Bank
51 West 52nd Street
New York, NY 10019

David Dunn and Lisa Fried
HOGAN LOVELLS US LLP                  Attorneys for Wells Fargo Bank, N.A,
875 Third Avenue
New York, NY 10022

_/s/ Edmund L. Smith_
Edmund Smith

*Exhibit A*

# Judith and Edmund Smith
## C/o General Delivery
## Las Vegas, New Mexico 87701

March 14, 2006

By Fax (225)215-7352 & Certified Mail, RR#
7004 2510 0004 1419 7991

UC Lending
10049 N. Reiger Road
Baton Rouge, LA 70809-4559

Gentle People:

This letter pertains to an <u>urgent</u> matter regarding a mortgage and related note, formerly held by UC Lending, issued to us, Judith B. and Edmund L. Smith, on February 18, 1999, which UC subsequently sold to another party, in July of 2000. Since the purchaser also became the new "Loan Servicer", pursuant to the original mortgage contract terms, UC Lending was required to notify us of the sale and the identity of the new purchaser/loan servicer, but failed to do so. As a result, we sent a payment by check to UC Lending, which should have gone to the new purchaser/loan servicer. UC *improperly* cashed our payment check, then, **unlawfully** failed to forward our payment to the new owner/loan servicer, or to refund us our payment amount, or to inform us that they had sold the mortgage, apprise us of the new owner and enable us to make payment to the proper party.

Recently, during a routine title search on our property, we were shocked to learn that UC's **sold mortgage** is *still* recorded in the office of the Santa Fe County, New Mexico, County Clerk, as a current encumbrance on our property, meaning that although UC sold the mortgage long ago, UC improperly failed to discharge the mortgage, related note and encumbrance recorded against our property. Thus, our property is still wrongfully and improperly encumbered by an instrument UC does not own and which was required to be discharged upon its sale. Since UC no longer has any lawful or legal interest or standing in this matter, due to its referenced sale, and because, as stated, any encumbrance on our property *should* have been discharged by UC Lending at the time of the sale, this wrongful encumbrance against our property, still recorded in the name of UC Lending, must be immediately discharged by UC Lending.

Accordingly, we hereby request that you immediately send us UC's written release of the referenced mortgage, related note, any liens, encumbrances and claims to the property named in the mortgage, and also send written Notice of Release and Discharge of same to the Office of the County Clerk, Santa Fe County, New Mexico. The referenced **mortgage instrument** is recorded in the office of the County Clerk of Santa Fe, New Mexico, in **Book 1606, at Page 103-111.**

Sincerely,
All Rights Reserved

*Judith Smith/agent*    *Edmund Smith, agent*
Judith B. Smith and Edmund L. Smith



PO Box 141358
Irving, TX 75014-1358

November 8, 2006

```
61038 0000704 001
JUDITH SMITH
PO BOX 2858
LAS VEGAS NM  87701-2858
```

*Exhibit B.*

RE: EMC Loan Number: 0005601042

Dear Mortgagor(s):

Do you want to avoid foreclosure?

Can you afford your monthly payments?

Do you want to sell your house, but owe more than what it is worth?

If you answered "yes" to any of these questions, you need to contact EMC Mortgage **immediately at 888/577-4011**. We may have a program available to assist you, but the only way we can help is if you call now. The longer you wait, the worse your situation becomes. Foreclosure is serious, and unless you act quickly, you may lose your home and your credit. **Our new hours are 7:00am-8:00pm Monday, through Friday, Central Time.**

Sincerely,

EMC Loan Workout Department
888/577-4011


Our conversations, this correspondence and our offer to review any information that you submit represent no guarantee that relief will be granted. All provisions of the Note and Security Agreement remain in full force. Servicing activity may continue, including, but not limited to, telephone calls, letters, property inspections, legal action, and foreclosure. If your obligation for this account was previously discharged in a Chapter 7 bankruptcy proceeding, and if the obligation was not reaffirmed, this letter is being sent for informational purposes only. EMC is not attempting to collect, recover or offset the discharged debt as your personal liability.

EMC Mortgage is writing regarding the collection of your loan; any information obtained may be used for that purpose.

**United Companies Signs Letter Agreement With EMC Mortgage Corporation for the Sale of Its Whole Loan Portfolio, Residual Interests and Servicing Operation.**

Dec 29, 1999

*Exhibit C*

Business
Editors

BATON ROUGE, La.--(BUSINESS WIRE)--Dec. 29, 1999

United Companies Financial Corporation (OTC:UCFNQ), which has been operating in chapter 11 reorganization since March 1, 1999, announced that today it signed a letter agreement for the sale of substantially all of the assets related to its mortgage servicing, whole loan portfolio and residual interests to EMC Mortgage Corporation, a wholly-owned subsidiary of The Bear Stearns Companies, Inc., for an aggregate purchase price of approximately $895 million subject to adjustments. Cash on hand and certain other assets are not included in the sale. The transaction is subject to the negotiation and execution of definitive documentation, which is expected to be completed in January 2000. The sale is further subject to the approval of the United States Bankruptcy Court and the submission of higher or better offers pursuant to bidding procedures to be established by the Bankruptcy Court, as well as the satisfaction of certain other conditions. The letter agreement also provides that United Companies may bifurcate the proposed transaction and sell its whole loan portfolio to another bidder or accelerate the sale of the whole loan portfolio to EMC.

On June 1, 1999, United Companies sold its loan origination platform to Aegis Mortgage Corporation. Since that time, United Companies has continued to service a multi-billion dollar portfolio of home equity and manufactured housing loans while developing strategies to address its financial difficulties.

"The EMC transaction will allow the Company to move closer to completing its reorganization efforts. We believe that this transaction, and the Bankruptcy Court approval process, will maximize the value of United Companies," said Lawrence J. Ramaekers, Chief Executive Officer of United Companies.

United Companies is a specialty finance company that services non-traditional consumer loan products.

The following is a "Safe Harbor" Statement under the Private Securities Litigation Reform Act of 1995: The statements contained in this release that are not historical facts are forward-looking statements based on the Company's current expectations and beliefs concerning future developments and their potential effects on the Company. There can be no assurance that future developments affecting the Company will be those anticipated by the Company. Actual results may differ from those projected in the forward-looking statements. These forward-looking statements involve significant risks and uncertainties (some of which are beyond the control of the Company) and are subject to change based upon various factors, including but not limited to the following risks and uncertainties: the developments in and outcome of the Company's Chapter 11 reorganization proceedings; the ability to access loan facilities in amounts necessary to fund the Company's operations; the successful disposition of its existing loan portfolio and repossessed real estate properties; the ability of the Company to successfully restructure its balance sheet; the ability of the Company to retain an adequate number and mix of its employees; the effect of the Company's policies including the amount of Company expenses; actual prepayment rates and credit losses on loans sold as compared to prepayment rates and credit losses assumed by the Company at the time of sale for purposes of its gain on sale computations; the quality of the Company's owned and serviced loan portfolio including levels of delinquencies, customer bankruptcies and charge-offs; adverse economic conditions; competition; various legal, regulatory and litigation risks and other risks detailed from time to time in the Company's Securities and Exchange Commission filings. The Company undertakes no obligation to publicly update or revise any forward-looking statements, whether as the result of new information, future events or otherwise.